702 P.2d 803

Keith JOHNSON, Claimant-Respondent,

v.

**AMALGAMATED SUGAR COMPANY,
Defendant-Appellant.**

No. 14746.

Supreme Court of Idaho.

June 17, 1985.

Henry F. McQuade, Nampa, for defendant-appellant.

Jerry Goicoechea and Lynn M. Luker, Boise, for claimant-respondent.

## ON REHEARING

HUNTLEY, Justice.

Following rehearing and further consideration, the Court withdraws its previous Opinion No. 53 of June 1, 1984 and this opinion is substituted therefore.

After twenty-five years of employment claimant Keith Johnson retired from Amalgamated Sugar Company in December, 1978, at the age of sixty-two. During his years of employment, claimant worked as a maintenance mechanic, equipment repairman, and operator of a beet dump shovel.

In the fall of 1979, Amalgamated asked claimant to work during the sugar beet harvest. He did so as a "car man," which involved moving and manipulating railroad cars as they were loaded and unloaded. It is not disputed that during the course of his regular duties as a "car man," the claimant suffered a heart attack as he exerted himself trying to free a car which was lodged on the tracks.

A diagnosis of acute myocardial infarction was made by Dr. Ivyl Wells. Dr. Wells had been claimant's attending physician for the prior twelve to fifteen years and was his treating physician throughout his stay in the hospital and during convalescence. Although Dr. Wells was a family practitioner, he had taken specialized training in cardiology throughout the country. His office was equipped with special cardiac equipment and stress testing equipment was also available.

After having been presented with Mr. Johnson's claim for disability payments arising from this work-related incident, Amalgamated denied liability on the basis that the work was casual employment not covered under workmen's compensation law, and asserted that claimant had not sustained any permanent disability. Upon a stipulated record, the Commission determined in an order dated November 30, 1981, that the employment involved was not casual, and that claimant was covered by workmen's compensation. Defendant has not appealed that ruling.

On July 30, 1982, the Commission entered an award finding that as a result of a work-related heart attack, claimant suffered temporary total disability, incurred medical expenses, had a permanent partial impairment of 50 percent of the whole person, and that claimant's partial disability is equal to this permanent impairment. The Commission also assessed attorney's fees against Amalgamated. Amalgamated appealed. Following a substitution of counsel for Amalgamated, occurring after its brief was filed, Amalgamated made payment of medical expenses and total temporary benefits.

The single dispositive issue on this appeal is whether the Commission erred in its evaluation of the medical testimony as being a proper predicate for an impairment rating of 50 percent of the whole man.

The evidence established that long before the subject "accident" Johnson had developed coronary heart disease, which manifests itself through angina or chest pains during prolonged exertion. (The disease is a partial plugging (occlusion) of the coronary arteries).

In questioning Dr. Wells, counsel *never* asked the doctor what impairment, if any, resulted from the acute myocardial infarction (heart attack). Rather, the questions put to the doctor were in terms of "heart condition" or "cardiac problems," and did not address heart muscle damage and resulting impairment from the heart attack as distinguished from the impairment exist-

ing because of preexisting coronary heart disease.[1] At no time was Dr. Wells asked nor, did he present testimony as to whether any part of the forty-five to fifty percent disability rating suggested was from the heart attack. Rather the symptomology—continued episodes of chest pain on exertion or emotional upset,—resulting in the fifty percent disability rating awarded by the Commission are symptoms which in fact arise from the coronary artery disease.

At the behest of Amalgamated the claimant was also examined by cardiac specialists Dr. Robert Hay and Dr. Marshall Priest. Both are cardiac specialists. Dr. Hays' testimony included the following (paraphrased and condensed):

1. Assessment is considered from what the patient relates. In this case, Johnson indicated he had occasional episodes of chest pain[2] when he exercised vigorously in the cold; under circumstances of normal activity, whether at home or otherwise, he did not have symptoms.

2. In terms of evidences of substantial damage, one important criterian is the extent to which the patient does or does not have cardiac enlargement, an enlarged heart indicating substantial damage. Johnson had a heart of normal size.

3. Was there any evidence of heart failure? That is, were there any circumstances where what he was trying to do exceeded the functional capacity of his heart to perform work. The doctor stated such was not the case.

4. The patient had a treadmill test. He was able to complete the standard Bruce Protocol in eight minutes, and during this test, the heart and lung capacity were actually measured. This was the combined functional integrity to perform work using the standard criteria for measuring his ability to do work. *He showed, in terms of the total time of exercise on the treadmill, no functional impairment. In terms of his ability to perform work, as measured by his maximum oxygen uptake capacity, his ability to perform work was slightly greater than average.* This test is the single best numerical measure available to determine what a person can or cannot do on a sustained basis. During the exercise test when we stressed him to the point where he could go no further, on that particular instance, he didn't experience chest pain and didn't experience any abnormal cardiac response. (Emphasis supplied.)

Dr. Hay concluded from the testing that Johnson could perform any sedentary activity and any activity requiring moderate manual labor. He could engage in his usual occupation of a scoop operator.

Dr. Hay further testified:

Again, let me add just a note, we presume, and his subsequent history has essentially affirmed, that he clearly has

---

1. "Q. Okay, Doctor, referring now specifically to impairment, which is physical factors only, and not giving consideration to his age and education; *do you have an opinion as to the degree of his permanent impairment related to his heart condition only?*
"A. Yes.
"Q. What would that be?
"A. Oh, forty-five to fifty percent impairment.
. . . .
"Q. Okay. Doctor, Dr. Priest, in his report, indicated that he felt Mr. Johnson had a Class 2 Impairment. What is your opinion as to the class of impairment he has from his cardiac problems?
"A. I would say between Class 2 and Class 3.

"Q. Okay. And what symptoms would he have to be in that category?
"A. Well, he does experience chest pain with highly emotional experiences and ..., in order to preclude any problem with that, he is on medication to keep him—
"Q. Is that antidepressant medication?
"A. Medication, antianxiety medication.
"Q. Do you feel he's got any significant phychological or depression [sic] following this injury?
"a. Yes."

2. The record establishes the chest pain is secondary to the coronary artery disease, not the infarction.

underlying coronary heart disease that he got on his own apart from his work, but it still seems reasonable that the actual event of the heart attack was precipitated by the unusual work that he was performing at the time.... But in his particular circumstance, his heart function in terms of actual pumping capacity has no outward evidences of impairment, the symptoms he has of angina do not relate to his heart pumping capacity, but relate to partial plugging or occlusion of his coronary arteries which lead to the symptom of heart pain in contrast to any symptoms as to an impairment of his heart pumping capacity....

Doctor Priest concluded that Johnson had Class 2 angina pectoris, but again that diagnosis is secondary to the coronary artery disease and not the infarction.

A disability evaluation of claimant was performed by psychologist Gina Wolf. In considering both non-medical factors and the medical evaluations of Drs. Hay and Wells, she concluded that claimant had a disability of 70 percent. Her testimony did not establish the disability as flowing from the infarction.

■ The Supreme Court will not disturb findings of fact by the Industrial Commission when they are supported by competent, although conflicting, evidence. *Lampe v. Zamzow's, Inc.*, 102 Idaho 126, 626 P.2d 782, 783 (1981); *Logsdon v. Northern Iron & Metals Co.*, 101 Idaho 74, 608 P.2d 877 (1980). We may set aside the Commission's findings of fact only if the record is devoid of substantial competent evidence to support them. *Paulson v. Idaho Forest Industries, Inc.*, 99 Idaho 896, 900, 591 P.2d 143, 147 (1979).

■ As the recitation of the testimony above demonstrates, this record is devoid of any substantial competent evidence to support the disability award of 50 percent of the whole man as arising from the infarction, and thus we must reverse and remand.

■ It is possible that the record will support some disability rating, such as possible psychological impairment from the fact of having suffered an infarction, or other bases not addressed in the Commission's findings and order. We therefore remand for the Commission to address that possibility.

■ One final issue remains, that of the Commission's award of attorney fees to claimant in the proceeding before the Commission. The record establishes that Amalgamated failed to file the Notice of Injury report required of employers by I.C. § 72–602. Commission Conclusion of Law IV reads:

### IV

The Employer in this matter is liable for the Claimant's attorney fees. The Employer's defense that the Claimant's employment was casual employment was a frivolous defense. The Commission additionally notes that the Defendants have failed to pay the Claimant any benefits, yet they have stipulated that the Claimant's heart attack was caused by his work, that the Claimant was totally and temporarily disabled for a nine-week period as a result of that heart attack and that the Claimant incurred over $3,000.00 in medical expenses as a direct result of the heart attack. The Employer acted unreasonably in this matter. The Claimant is entitled to an award of attorney fees.

The Commission finds that one-third of the total recovery is a reasonable sum for the services of the Claimant's counsel in this matter.

Our reversal today does not abrogate the basis of the fee award and therefore the award will stand.

Costs to the appellant. No attorney fees on appeal.

DONALDSON, C.J., and SHEPARD and BAKES, JJ., concur.

BISTLINE, Justice, dissenting.

## I.

Earlier this year in *Horner v. Ponderosa Pine Logging,* 107 Idaho 1111, 695 P.2d 1250 (1985), another myocardial infarction case, although I concurred in the Court's opinion which upheld an Industrial Commission decision, I wrote separately to suggest considerable difficulty in rationalizing the different result of that case as compared to *Johnson*—this case, which was at that time pending before us on a petition for rehearing—which was subsequently granted.

Today's opinion for the Court now reverses the Industrial Commission, and in doing so withdraws our earlier opinion which upheld the Commission's award of benefits. Not persuaded, I stand on the earlier opinion which saw no reversible error on the part of the Commission, and restate it as the only proper resolution of this appeal.

## II.

Claimant, Keith Johnson, retired at the age of 62 from Amalgamated Sugar Company in December, 1978, after 25 years of employment. During his years of employment, claimant worked as a maintenance mechanic, equipment repairman, and operator of a beet dump shovel.

In the fall of 1979, Amalgamated asked claimant to work during the sugar beet harvest. He did so as a "car man," which involved moving and manipulating railroad cars as they were loaded and unloaded. It is not disputed that during the course of his regular duties as a "car man," the claimant suffered a heart attack as he exerted himself trying to free a car which was lodged on the tracks.

A diagnosis of acute myocardial infarction was made by Dr. Ivyl Wells. Dr. Wells had been claimant's attending physician for the prior twelve to fifteen years and was his treating physician both throughout his stay in the hospital and during convalescence. Although Dr. Wells specialized generally in family practice, he had taken specialized seminar training in cardiology throughout the country. His office was equipped with special cardiac equipment and stress testing equipment was also available.

It was the opinion of Dr. Wells that claimant's physical exertion at work was the cause of his heart attack. Based upon claimant's symptoms, Dr. Wells determined that claimant had between a class 2 and class 3 heart impairment, under the published AMA guidelines, and rated claimant as having a permanent impairment of 45 to 50 percent. Dr. Wells also testified that although claimant could thereafter perform sedentary work, he was nonetheless totally disabled, based upon his permanent impairment, education, and experience.

The claimant was also examined by cardiac specialists Dr. Robert Hay and Dr. Marshall Priest at the behest of Amalgamated. Both are cardiac specialists. Dr. Hay concluded that the claimant had suffered a myocardial infarction, which he described as follows:

"It clearly was not tiny and it clearly was not massive, but to precisely quantify it, it would depend on the data obtained at the time of the infarction. Again, what I was seeing was the effect on the patient somewhat more than a year later."

Hay Deposition, p. 8, 1. 24—p. 9, 1. 3. Dr. Hay concluded from his examination that claimant could perform any sedentary activity and any activity requiring moderate manual labor, and, specifically, that he could operate a scoop machine, but could not, however, do the kind of heavy, strenuous work that he had been engaged in at the time of his heart attack.

Dr. Priest concluded from his examination of the claimant that he had class 2 angina pectoris. He stated that, though claimant could perform less strenuous types of physical activity, he was "disabled from performing very strenuous activities such as those that he was engaged in at the time he sustained the myocardial infarction in October, 1979."

A disability evaluation of claimant was performed by psychologist Gina Wolf. In considering both non-medical factors and the medical evaluations of Drs. Hay and Wells, she concluded that claimant had a disability of 70 percent.

After having been presented with Mr. Johnson's claim for disability payments arising from this work-related incident, Amalgamated denied liability on the basis that the work was casual employment not covered under workmen's compensation law, and asserted that claimant had not sustained any permanent disability. Upon a stipulated record, the Commission determined in an order dated November 30, 1981, that the employment involved was not casual, and that claimant was covered by workmen's compensation. Defendant has not appealed that ruling.

On July 30, 1982, the Commission entered an award finding that as a result of a work-related heart attack, claimant suffered temporary total disability, incurred medical expenses, had a permanent partial impairment of 50 percent of the whole person, and that claimant's partial disability is equal to his permanent impairment. The Commission also assessed attorney's fees against Amalgamated. Amalgamated appealed. Following a substitution of counsel for Amalgamated, occurring after its brief was filed, Amalgamated made payment of medical expenses and total temporary benefits.

The issues on appeal narrow down to these:

No. 1: Did the Commission err in its evaluation of medical testimony?

No. 2: Was the Commission's finding that claimant's disability equaled his impairment proper?

No. 3: Did the Commission err in awarding attorney's fees?

No. 4: Is claimant entitled to attorney's fees on appeal?

We begin by noting that the Supreme Court will not disturb findings of fact by the Industrial Commission when they are supported by competent, although conflict-ing, evidence. *Lampe v. Zamzow's, Inc.*, 102 Idaho 126, 127, 626 P.2d 782, 783 (1981); *Logsdon v. Northern Iron & Metals Co.*, 101 Idaho 74, 608 P.2d 877 (1980). We may set aside the Commission's findings of fact only if the record is devoid of substantial competent evidence to support them. *Paulson v. Idaho Forest Industries, Inc.*, 99 Idaho 896, 900, 591 P.2d 143, 147 (1979).

The Commission's finding that the claimant Johnson suffered a permanent partial disability of fifty percent of the whole person is supported by substantial competent evidence. Johnson's longstanding personal physician, Dr. Wells, who treated him throughout his recovery from the heart attack, rated Johnson as *totally* disabled and as having a permanent impairment of forty-five to fifty percent. In addition, Psychologist Gina Wolf, after considering all medical evaluation, concluded that Johnson was seventy percent disabled. Finally, we note that Dr. Priest, himself a Board certified cardiologist, concluded from his examination that Johnson was permanently disabled from performing strenuous activities such as the job-related activity he was engaged in at the time of his heart attack. We conclude that this constitutes substantial and competent evidence to support the Commission's determination.

However, Amalgamated argues that the Industrial Commission erred in its evaluation of medical testimony by essentially disregarding the expertise of its medical expert, cardiologist Dr. Hay. In addition, it appears to be Amalgamated's contention that the Commission is obliged to accept the evaluation of such a heart specialist when it is contradicted only by the testimony of a general practitioner. Amalgamated relies upon *Howard v. Washington Water Power Co.*, 65 Idaho 339, 144 P.2d 210 (1943), for the proposition that the opinion of a medical specialist should control over that of a general practitioner. We disagree.

In reaching its factual determinations, the Industrial Commission is not bound to accept the opinion of any particular doctor.

See Paulson v. Idaho Forest Industries, Inc., supra, 99 Idaho at 901, 591 P.2d at 148. The opinions of an expert are not binding upon the trier of fact, but are advisory only. Graves v. American Smelting & Refining Co., 87 Idaho 451, 455, 394 P.2d 290, 293 (1964). In addition, it is clear that Amalgamated's reliance upon Howard v. Washington Water Power, supra, is misplaced. Howard stands for the proposition that in considering conflicting medical testimony proffered by two doctors, one of whom is a general practitioner and the other of whom is a medical specialist in a relevant field, the enhanced expertise of the specialist is one factor to be taken into consideration in weighing the evidence. Howard, supra, 65 Idaho at 346, 144 P.2d at 213. In the present case, it is clear that the Industrial Commission took note of Dr. Hay's credentials [1] and we are not shown that such was not considered in the Commission's evaluation of his deposition testimony. Moreover, it is also true that the report of the attending or treating physician "should be given at least as great, if not greater weight than [that] of a physician who examined the claimant only prior to trial." Graves, supra, 87 Idaho at 456, 394 P.2d at 293. See also Stralovich v. Sunshine Mining Co., 68 Idaho 524, 533, 201 P.2d 106, 112 (1948). This principle was implicitly recognized by Dr. Hay himself, when he admitted that as to Johnson's heart infarction, he could not precisely quantify it, for the ability to do so "would depend on the data obtained at the time of the infarction." (Hay Deposition, p. 8, 1. 25—p. 9, 1. 1). In the present case, Dr. Wells was Johnson's attending physician both at the time of the heart attack, and thereafter, as he had been for the previous 12–15 years. By way of contrast, Dr. Hay saw claimant only twice—the first time being some one and one-quarter years after the heart attack occurred. Accordingly, we hold that the Industrial Commission was justified in weighing the evidence as it did. We are persuaded that the Commission did not err as a matter of law in its evaluation of the medical testimony.

Amalgamated also argues that the Industrial Commission erred when it found in its Finding of Fact No. VII and Conclusion of Law No. III that Johnson's permanent partial disability is equal to his permanent partial impairment of fifty percent. Amalgamated objects that "the commission did not make statutory findings of fact as to occupation, age at time of the accident, claimant's ability to compete in the open labor market and all other factors which relate to the claimant and his work capability." Appellant's Brief, p. 18. In support of its claim, Amalgamated directs our attention to I.C. § 72–425 and the recent cases of Lyons v. Industrial Special Indemnity Fund, 98 Idaho 403, 565 P.2d 1360 (1977); and Francis v. Amalgamated Sugar Co., 98 Idaho 407, 565 P.2d 1364 (1977).

Amalgamated's argument misconceives both the proper analysis to be applied and the true significance of the cited cases. Both Lyons and Francis specifically deal with a claimant who should have been placed in the so-called "odd lot" category. "Odd lot" workers are employees who are so injured that they can perform no service other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist. Gordon v. West, 103 Idaho 100, 103, 645 P.2d 334, 337 (1982); Reifsteck v. Lantern Motel & Cafe, 101 Idaho 699, 670, 619 P.2d 1152, 1153 (1980). A finding by the Industrial Commission that a claimant is in the odd-lot category results in the burden of proving the extent to which the claimant is disabled being shifted from the claimant to the employer. Lyons, supra, 98 Idaho at 406, 565 P.2d at 1363. In Lyons and Francis, this Court held that a finding of only partial disability by the Commission requires "an explicit finding of what kind of suitable work is available to the claimant who is in the odd lot category." Francis,

---

1. The Industrial Commission referred to the fact that Dr. Hay was a cardiologist in its Finding of Fact No. VI, R., p. 74.

*supra* at 409, 565 P.2d at 1366. Thus, it is clear that the purpose of these cases is not, as Amalgamated apparently argues, to make it more difficult for claimants to gain partial disability awards by requiring specific findings by the Commission as to the various factors contributing to such disability. Rather, *Lyons* and *Francis* seek to facilitate total disability awards for claimants found to be in the odd lot category by requiring the Commission to provide explicit justification for any finding that such an odd lot employee is deserving of only partial disability compensation.

In any event, the significance of *Lyons* and *Francis* is clearly limited to workers found to be in the odd lot category. In the present case, however, the Industrial Commission specifically found that "[t]he Claimant has failed to establish that he is in the odd-lot category, or that he is totally and permanently disabled." Conclusion of Law No. III, R., p. 75. Thus, neither case required the Commission in this case to make findings of fact as to the various non-medical factors it considered in arriving at its award of partial disability compensation.

Similarly, nothing in the language of either I.C. §§ 72–425 or –430 requires the Industrial Commission to make specific findings of fact as to every non-medical factor considered in the permanent disability evaluation process. Indeed, a simple reading of the statutes reveals their obvious intent to be precatory, not mandatory. I.C. § 72–430, dealing with the determination of permanent disability, authorizes the Industrial Commission to take account of "other factors such as the commission may deem relevant." Such a grant of discretion in the evaluation process clearly belies the assertion that the statute was intended to create a rigid checklist requirement that the commission make specific findings as to each enumerated factor. In our view, the language of I.C. §§ 72–425 and –430 was intended to assist the Industrial Commission in its determination of permanent disability by suggesting various relevant factors. We decline to construe these statutory provisions as mandating cumbersome written findings as to every conceivable relevant factor. It is only necessary in considering relevance to remember from the opening sentence of this opinion that Mr. Johnson had retired from the labor force in 1978, but a year later returned to work for Amalgamated at Amalgamated's request. After he suffered the myocardial infarction and resultant permanent heart damage he obviously was no longer a candidate for the labor force. The permanent heart damage together with his history of pre-existing but nondisabling heart disease—plus his having achieved retirement age and having already once retired, surely foreclosed any thought that he remained a sound prospect for any further permanent or prolonged employment. Accordingly, the Industrial Commission, far more expert and far more versed in these matters than any member of this Court, properly saw no influencing non-medical factors to consider, and accordingly fixed his disability as being the equivalent of his physical impairment.

In addition, Amalgamated argues that, under this Court's recent decision in *Jones v. State,* 104 Idaho 337, 659 P.2d 91 (1983), latent and asymptomatic illness is not compensable, apparently referring to the medical testimony that Johnson suffered arteriosclerosis, a coronary heart disease.

However, even conceding that Johnson did suffer from arteriosclerosis, we still must reject Amalgamated's argument that such is sufficient in this case to preclude compensation to Johnson. In this regard it is sufficient to note that our holding in *Jones* was confined to the issue of who, as between the employer and Industrial Special Indemnity Fund was liable for a "preexisting impairment" within the meaning of I.C. § 72–332(2). The issue in *Jones* was clearly not, as in the present case, whether or not the employee was entitled to recover, but rather who was to be liable for that recovery. Furthermore, this Court in *Jones relied heavily upon our holding in Royce v. Southwest Pipe of Idaho, 103 Idaho 290, 294, 647 P.2d 746, 750 (1982), that the employer is fully liable for all pre-existing conditions* not manifest at the

time the work-related injury occurs. Because the alleged arteriosclerosis was not manifest within the meaning of *Royce*, i.e., neither the employer nor the employee was aware of the condition at the time Johnson's heart attack occurred, Amalgamated must bear full liability for the work-related injury and any disability resulting therefrom—even if such disability is in part the result of a non-manifest pre-existing condition. *Royce, supra* at 295, 647 P.2d at 751.

However, Amalgamated claims that, whereas *Jones, supra,* involved a pre-existing condition in combination with an accident which rendered claimant totally disabled, the present case bears witness to no such disabling injury. Johnson's arteriosclerosis, Amalgamated argues, results only in his exercising caution in his lifestyle, not in disability.

It cannot be gainsaid, however, that such determinations of fact are within the province of the Industrial Commission. It was the finding of the Commission that Johnson's heart attack was the result of a work-related injury, and that such injury *resulted in a fifty-percent permanent partial disability. Because this finding is supported by competent and substantial evidence in the record, it cannot be overturned on appeal.* The presence of arteriosclerosis at the time the injury occurred in no way alters our analysis.

Finally, we reach the issue of attorney's fees. The Industrial Commission imposed liability on Amalgamated for Johnson's attorney's fees. I.C. § 72–804 states that the employer shall pay reasonable attorney's fees (as fixed by the commission):

If the commission or any court before whom any proceedings are brought under this law determines that the employer ... contested a claim for compensation made by an injured employee ..., without reasonable ground, ... or that an employer ... refused within a reasonable time after receipt of a written claim for compensation to pay to the injured employee ... the compensation provided by law....

In this case, the Commission not only found to be frivolous the employer's defense that the claimant's employment was casual, but noted that the employer failed to pay any benefits even after stipulating that claimant's injury was caused by work. Conclusion of Law No. IV, R., p. 75. Such a finding is a factual determination which rests with the Commission. *Troutner v. Traffic Control Co.,* 97 Idaho 525, 528, 547 P.2d 1130, 1133 (1976). The Industrial Commission's determination that attorney's fees were appropriately awarded to Johnson in this case is supported by substantial evidence and will not be set aside on appeal. Idaho Constitution, art. 5, § 9; I.C. §§ 72–724, –732; *Troutner, supra* at 528, 547 P.2d at 1133.

The award of the Industrial Commission is affirmed. Costs on appeal to respondent, but no attorney's fees awarded.

Prior opinion of June 1, 1984.

### III.

Comment may be helpful in understanding whereby the present majority goes astray. In the most recent heart case—*Horner*, of course—the Court's opinion noted that "Claimant challenges the Commission's heavy reliance on Dr. Smith's testimony instead of the testimony of the attending physician, Dr. Wolff or the family physician, Dr. Garney." This contention was disposed of in two sentences: "However, the Commission is not bound to accept the opinion of any particular doctor.... The Commission's reliance on Dr. Smith's testimony was not improper." End of opinion; end of message sent out. If today's majority opinion makes any mention of *Horner*, either to question, endorse, or distinguish, I am unable to discover it. Reciting certain selected medical testimony, the majority is able to say that "this record is devoid of any substantial competent evidence to support the disability award of 50 percent of the whole man...." Not only does the majority avoid *Horner*, but also avoided is *Paulson v. Idaho Forest Industries,* 99 Idaho 896, 591 P.2d 143 (1979), which was the citation for the

above-quoted statement that "the Commission is not bound to accept the opinion of any particular doctor." The foregoing opinion which I authored relied upon *Paulson*, just as *Horner* did.

With that much in mind, it is then in order to review another recent worker's compensation case, *Wynn v. J.R. Simplot Co.*, 105 Idaho 102, 666 P.2d 629 (1983). Language therein which is here equally applicable, but apparently overlooked by the majority, is found in this discussion:

> It is enough to note that claimant here, as indicated by the medical evidence, suffered his injury at a particular time, at a particular place, while engaged in his normal and ordinary work for his employer. The fact that Wynn's spine may have been weak and predisposed him to a ruptured disc does not prevent an award since our compensation law does not limit awards to workmen who, prior to injury, were in sound condition and perfect health. Rather, an employer takes an employee as he finds him. *Miller v. Bingham County*, 79 Idaho 87, 310 P.2d 1089 (1957); *Lewis v. Department of Law Enforcement*, 79 Idaho 40, 311 P.2d 976 (1957); *Warlick v. Driscoll*, 68 Idaho 552, 200 P.2d 1014 (1948); *Teater v. Dairy-men's Cooperative Creamery*, 68 Idaho 152, 190 P.2d 687 (1948); *Cain v. C.C. Anderson Co.*, 64 Idaho 389, 133 P.2d 723 (1943); *Woodbury v. Arata Fruit Co.*, 64 Idaho 227, 130 P.2d 870 (1942); *Aranguena v. Triumph Min. Co.*, 653 Idaho 769, 126 P.2d 17 (1942); *Paull v. Preston Theaters Corp.*, 63 Idaho 594, 124 P.2d 562 (1942); *In re Soran*, 57 Idaho 483, 67 P.2d 906 (1937); *Beaver v. Morrison-Knudsen Co.*, 55 Idaho 275, 41 P.2d 605 (1935); *Fealka v. Federal Min. Etc. Co.*, 53 Idaho 362, 24 P.2d 325 (1933); *Strouse v. Hercules Min. Co.*, 51 Idaho 7, 1 P.2d 203 (1931); *Hanson v. Independent School Dist. 11*, 50 Idaho 81, 294 P. 513 (1930); *In re Larson*, 48 Idaho 136, 279 P. 1087 (1929).

As this Court has repeatedly stated, "If the claimant be engaged in his ordinary usual work and the strain of such labor becomes sufficient to overcome the resistance of the claimant's body and causes an injury, the injury is compensible." *Whipple v. Brundage*, 80 Idaho 193, 327 P.2d 383 (1958); *Lewis v. Dept. of Law Enforcement*, 79 Idaho 40, 311 P.2d 976 (1957). In *Hammond v. Kootenai County*, 91 Idaho 208, 419 P.2d 209 (1966), this Court affirmed a Commission award when a deputy sheriff died of a rupture or occlusion of a major vessel within the brain while he was engaged in normal routine activities of investigating an accident scene. Claimant had for some years suffered from hypertensive cardiovascular disease. *Wynn, supra*, at 104–05, 666 P.2d at 631–32.

Having thus set the stage, it is then in order to note the thrust of Amalgamated's brief which is that claimant had coronary disease on the day of the heart attack. No one questions that this was a condition which pre-existed the heart attack. The cause of the heart attack is well stated in Amalgamated's brief: "On the day Johnson suffered his myocardial infarction, he was *moving a railroad car* by means of a handjack. The car became lodged on the track and while he was *jumping up and down on the jack*, he experienced severe chest pain resulting in his heart attack."

The entire thrust of this appeal, and the contention which has now deprived Johnson of compensation benefits for an inexcusably long time is this—and *only* this:

> The Industrial Commission disregarded the expertise of the two cardiologists and accepted the conclusions and opinion, as to degree of impairment, of a family doctor. It is not to be said that a family doctor who treats a patient over a long period of time does not have the interest of his client uppermost in his mind, but there are distinct differences in the competency and training of these physicians. Appellant's Brief, p. 13.

The argument offered in support of that contention was hardly persuasive, and not at all convincing:

> Evaluation of expert testimony is left to the Commission, but it cannot dis-

regard competent evidence and rely solely upon marginal evidence. This court has stated in *Howard v. Washington Water Power Co.*, 65 Idaho 339, 144 P.2d 210 (1943) that in weighing evidence between a general practitioner and a specialist, the Court would take the fact into consideration. In the *Howard* case, the court found on the basis of the deposition of the cardiologist rather than on the deposition of the general practitioner. *The Court in that case also stated it was the duty of the court to examine the evidence when by deposition, and determine its value.*[1]

*The rule regarding evaluation of expert witnesses is still the law in the State of Idaho* and it is incumbent upon the Industrial Commission to follow the law as announced by the Supreme Court. In this particular case, the action is more pronounced because two cardiologists set the standard of practice in Idaho. The Commission disregards that standard and, in a cavalier fashion, erroneously evaluates the physical condition of the claimant and more so in evaluating the physical impairment. Two cardiologists, experts in their field and accepted by their peers in the field of cardiology as "fellows" set the standard of practice in the area of Nampa, Boise and Mountain Home. *The Commission is obliged to accept the evaluation of these physicians as compared to a family physician who occasionally practices cardiology.* In the area of malpractice, the legislature, which set standards for the commission, set standards for the medical experts. Idaho Code 6–1012. The standard of care in the field of cardiology is established by Diplomates in the field of internal medicine and Fellows in the American College of Cardiology.

These standards are established by the American Medical Association in pursuit of providing the finest medical care and treatment to the American public. It is not fitting for the Industrial Commission to peremptorily accept a very low standard of health care and evaluation of humans for treatment. All other fields of the practice of law require the best evidence to be utilized in weighing which evidence is the more worthy, and what weight is to be attached to evidence submitted. Obviously, opinions of a lay person will not be given weight or credence as that of a trained professional. On the other hand, the opinion of a trained professional must also give way to that of highly trained professionals who are the only experts accepted by their peers. If the American Medical Association would not accept the evaluation of Dr. Wells as against Drs. Hay and Priest, then as a matter of justice to the people of Idaho, this court should prefer the testimony of Hay and Priest over that of Wells. This being the case, the award by the Commission must be reversed and judgment entered by the Court, or that the case be returned to the Commission with instructions to find for Amalgamated.

. . . .

*... Dr. Wells probably did his very best in treating and evaluating Johnson,* but that is not good enough when technically better and medically superior skills are available. The rule has always been, that the best technical skill and ability to diagnose is more credible and susceptible, and of greater weight than inferior skill as a basis for judgment.

. . . .

The American Medical Association through its Board of Internal Medicine and the College of Cardiology have clearly established the skills and judgments of Drs. Hay and Priest. Physicians who are not designated as Board Members, Fellows, or Diplomates do not possess the skills and judgments to equate with those physicians so designated and qualified. The courts give greater weight to experts who have the greater knowledge and expertise in a given science and less-

1. Amalgamated accurately cites *Howard, supra,* for the proposition stated. In stating the proposition, the Court relied on *Phipps, supra,* discussion of which is found *infra,* along with *Booth v.* *City of Burley,* 99 Idaho 229, 580 P.2d 15 (1978), and *Mager v. Garrett Freightlines,* 100 Idaho 469, 600 P.2d 773 (1979), which overruled *Phipps* and its progeny.

er weight to those "experts" not as well qualified and trained. Appellant's Brief, pp. 13–17 (emphasis added).

And, finally, Amalgamated goes so far as to rely upon *Jones v. Industrial Special Indemnity Fund*, 104 Idaho 337, 659 P.2d 91 (1983). It says this, and only this, of *Jones*, that this Court there held "that latent and asymptomatic condition is not compensable." That case is wholly inapplicable, as quickly demonstrated in claimant Johnson's brief:

> In *Jones* the Commission found that the claimant's pre-existing condition was asymptomatic, and therefore *denied the employer* contribution from the Idaho Special Indemnity Fund. This Court affirmed that decision in a short per curiam opinion, relying on the recent decision of *Royce v. Southwest Pipe of Idaho*, 103 Idaho 290, 647 P.2d 746 (1982). The effect of the decisions in *Jones* and *Royce* is *not* to relieve *the employer* of liability in cases of latent pre-existing conditions, but rather to relieve the *Indemnity Fund* of liability in such situations, and affirm full liability for disability upon the employer. Respondent's Brief, pp. 9–10.

The answer to be given on this appeal is simply that the Court should cite *Horner, Paulson, Wynn*, and affirm, as we once did. Johnson should have been receiving benefits one year ago when our first opinion was announced. Instead, because Justice Huntley and Justice Bakes were then impressed that "Two medical specialists testified that symptomology derives from the pre-accident disease," (prior 1984 dissent, now withdrawn), confusion in the ranks was created, a petition for rehearing was granted, and the majority now issues an opinion not in the slightest based upon the contentions which Amalgamated raised on the appeal. Breaking away from sound appellate practice, the majority is blatantly guilty of ignoring the plain fact that Amalgamated appealed to urge upon us an overruled case, *Howard*. More importantly, the majority is equally guilty of ignoring the equally plain fact that *Amalgamated did not challenge the sufficiency of the evidence* to sustain the fixing of impair-

ment and rating at 50 percent, but is here insisting that the Commission erred in not basing its determination on testimony of "experts of greater expertise" as against experts less qualified—clearly flying into the winds of *Horner* and *Paulson*.

Now the new majority, venturing forth on a different tack of its own, bases a reversal of the Commission on the failure to ask Dr. Wells "as to what impairment, if any, resulted from the heart attack." With all due respect, the majority may be seen as engaging in a wee bit of semantic sophistry. There could be little doubt that the Commission was not troubled with the manner of questioning and answering—and rather had no trouble in perceiving and comprehending the content of the testimony received from Dr. Wells. The *Paulson* case, relied upon by this same Court just a few months ago in *Horner*, should be guiding the majority in the proper direction. There it was said:

> Exact linguistic usage may be critical when a medical expert appears to base an opinion concerning cause and effect upon a mere possibility instead of probability, or when a requirement of medical certainty is erroneously substituted for the probability benchmark. *However, no special verbal formula is necessary where, as here, a doctor's testimony plainly and unequivocally conveys his conviction that events are causally related. Paulson v. Idaho Forest Industries, Inc.*, 99 Idaho 896, 591 P.2d 143, 144 (1979) (emphasis added).

With the foregoing in mind, we examine its second applicability to this case. Dr. Wells was asked to evaluate total post-infarction impairment:

> Q. Okay, Doctor, referring now specifically to impairment, which is physical factors only, and not giving consideration to his age and education; *do you have an opinion as to the degree of his permanent impairment related to his heart condition only?*
>
> A. Yes.
>
> Q. What would that be?

A. Oh, forty-five to fifty percent impairment.

It appears that the AMA has established classes of impairment and that these classes guide medical testimony. Dr. Wells still testifying:

Q. Okay. Doctor, Dr. Priest, in his report, indicated that he felt Mr. Johnson had a Class 2 Impairment. What is your opinion as to the class of impairment he has from his cardiac problems?

A. I would say between Class 2 and Class 3.

Q. Okay. And what symptoms would he have to be in that category?

A. Well, he does experience chest pain with highly emotional experiences and....

Wells Deposition, pp. 11–12.

There was no discussion whatsoever of impairment, if any, occasioned by the claimant's pre-existing heart disease; the "heart condition" referred to was the condition of the claimant's heart following and as a result of the claimant's work-related heart attack.

In addition, there is other testimony to indicate that some, if not all, permanent physical impairment did result from the heart attack itself. First, Dr. Wells testified on cross-examination that, as a result of his heart attack, claimant's risk of suffering another heart attack became greater than it otherwise would have been. Wells Deposition, p. 16. This was akin to Dr. Hay's testimony that, *"in one who's had a heart attack, a bona fide mycardial infarction, where there's been heart muscle damage, his heart will never be the same as if that hadn't happened."* Hay Deposition, p. 30. The Commission could readily infer that this was tantamount to stating that claimant's heart was damaged by the infarction—a question which no one ever specifically remembered to ask. The claimant was thus left with a greater propensity for heart attacks in the future; such is certainly cause for psychological depression and emotional distress which would prevent him from the same level of physical performance that would he otherwise

have enjoyed. (*See* Wells' testimony regarding claimant's cardiac anxiety, and the resultant need for anti-depressant medication. Wells Deposition, p. 25.) Such increased chances of heart attack, even without observed impairment, also would decrease employability with regard to any kind of job—this, however, going more to the second question of permanent disability—which has been pointed out above is not a problem, because disability was rated at impairment.

Second, the claimant's impairment from the myocardial infarction is also shown by the occurrence of chest pains which the claimant experienced apparently for the first time after the heart attack. No evidence is found in the record to support the view that the chest pains were present before the heart attack, Dr. Hay himself stated that "in assessing the amount of impairment or damage" due to the heart attack, he considers "what the patient tells us." "[I]n this instance Mr. Johnson indicated that he had occasional episodes of chest pain when he exercised vigorously in the cold." Hay Deposition, p. 9. Such evidence of chest pain occurring for the first time after the heart attack is circumstantial evidence which, in a workmen's compensation proceeding, enhances the claimant's case. *Gjerning v. Potlatch Forests, Inc.*, 91 Idaho 15, 415 P.2d 301 (1966). *See also Dawson v. Hartwick*, 91 Idaho 561, 569, 428 P.2d 480, 487 (1967).

Before us is also the fact that prior to the heart attack claimant was not medically restricted in any way, but after the work-related injury his physician urged him not to return to occupational labor of any kind; *all* agree that he may not engage in strenuous manual activity. Claimant suffers chest pains and is under medication for depression related to that heart attack. "Permanent impairment" is the physical abnormality or loss caused by or remaining after the accident or injury, *Thom v. Callahan*, 97 Idaho 151, 540 P.2d 1330 (1975), and in this case it is clear that claimant was not the same after the heart attack as before. The Commission could therefore

justifiably find that claimant did in fact suffer some physical impairment from the heart attack itself.

This Court's decisions have established that the Industrial Commission

> is authorized to find causes of disability if attributable to more than one factor and to apportion disability between an industrial injury and pre-existing infirmity.... Because the Board is presumed by its experience to be able to judge causative factors of disability in a particular case, the rule has been established that the [Commission] must be allowed some degree of latitude in making an apportionment. *Dawson, supra.*

A reminder to the majority, the findings of the Commission demonstrate that it considered the opinions of Dr. Wells, Dr. Hay, and Dr. Priest, the latter two favoring Amalgamated.[2] Dr. Wells' testimony was evaluated in the same findings as constituting his opinion that "Claimant's permanent partial impairment, which resulted from his heart condition, is 45 to 50% of the whole man." As pointed out, *the THEN present heart condition of Mr. Johnson was post-heart attack, post-recovery, and based on the impairment which the whole Mr. Johnson was found to have,* and by the doctor who knew the most about his previous pre-heart attack condition. All of which leaves me at a complete loss to understand that this Court, nearly all members of which just recently joined the unanimous *Horner* decision, has chosen in this particular case to exercise a medical expertise at odds with the Commission's.

## IV.

(Foreward: Although this part is only tangentially relevant to the case at bench, it may prove of extreme interest to those practitioners who regularly try worker's compensation cases to referees, and to those who sometimes extend aid to unemployment benefit claimants.)

Turning again to *Phipps, supra,* a 1943 case which was the original source for the case which was the backbone of Amalgamated's appeal, it will be noted that in our recent *Horner* case my reason for writing separately was to question the use of *Booth v. City of Burley,* 99 Idaho 229, 580 P.2d 75 (1978), a Department of Employment case passing through the Commission which heard it as an appellate court, as the occasion for overruling *Phipps* and its progeny. *Mager v. Garrett Freightlines,* 100 Idaho 469, 600 P.2d 773 (1979), also relied upon in *Horner, supra,* was another unemployment benefits case—and hence of the same ilk as *Booth,* standing upon poorer footing—simply because the *Mager* majority holding was that the Commission's facts were substantiated. Reference to *Booth* was pure dictum. Facts found below by the Commission and on appeal then brought before this Court were made after the Commission received additional evi-

2. The pertinent findings of fact are as follows:

### V.
Dr. Wells, the Claimant's attending physician, testified by deposition in this matter. In his opinion, the Claimant's permanent partial impairment, which resulted from his heart condition, is 45 to 50% of the whole man. Dr. Wells based his opinion on the AMA Guides to the Evaluation of Permanent Impairment. He placed the Claimant right between the class two and class three impairment classification.

### VI.
Dr. Hay, a cardiologist, examined the Claimant on January 12, 1981 pursuant to the request of Mr. Williams, defense counsel. Dr. Hay reported that the Claimant does not have any significant disability.

Dr. Priest examined the Claimant on December 29, 1981, pursuant to the request of the Claimant's counsel. Dr. Priest reported that the Claimant is disabled from performing very strenuous activities such as he was engaged in at the time of his October 12 heart attack. Dr. Priest did not believe that the Claimant would be disabled from performing less strenuous activities. He found that the Claimant had a stable, class two angina pectorius, which occurs with moderate effort and which is relatively easily predictable. See Hay deposition, Exhibit No. 2.

### VII.
The Commission finds that the Claimant has suffered a 50% of the whole man permanent partial impairment as a result of his October 12, 1979 heart attack.

The Commission finds that the Claimant's permanent partial disability is equal to his permanent partial impairment rating. R., p. 74.

dence which had not been presented to the Department of Employment's appeals examiner—which sometimes happens. When it does happen, then a further appeal to this Court is not on the same record which was transmitted to it from the Department of Employment. This Court, however, had before it in *Mager* the same cold record which was before the Commission. Hence, under *Phipps*, we *could* have made our own independent determination of the issue of eligibility, but would not have been obliged to do so—which is as it should be, and ever was so prior to *Booth.*

In *Horner* I concluded with the statement that an extensive review of *Booth* being made in another such case then under consideration convinced me of *Booth's* invalidity. That other case has since been decided—*Small v. Jacklin Seed Co.,* (Idaho Sup.Ct. No. 14994, issued May 29, 1985). In *Small* the invalidity of *Booth* is well-demonstrated, and it is to be hoped that its inopportune overruling of *40 years of sound precedent* will soon itself be overruled, and *Phipps* become reinstated. *Small, supra* (Bistline, J., writing separately).

*Phipps,* even had it not been overruled by *Booth,* would not be of any aid to Amalgamated in this case. *Phipps* was an unemployment compensation case, and heard by the Industrial Commission in its appellate capacity on an *entirely* cold record. Although in *Horner* no witnesses appeared before the Commission, the latter accepting and adopting the conclusions of the referee, there was good reason for concern at reliance on *Booth* and *Mager* where the Commission did not make its review as an appellate court—which is the extent of its function in unemployment cases—but as the original determiner of fact. A more important point, however, is the distinction between unemployment cases and industrial accident cases. When we review the former there is not the often critical factor of medical expertise. In the latter there is, and this Court has said that in industrial accident cases it will defer to the expertise which the members of the Industrial Commission acquire over long years dedicated to receiving and *evaluating* the testimony of professionals. *Dawson, supra.*

Recently in another case I inserted some language, not my own, but upon which I could not hope to improve, which is equally applicable in assessing the new opinion for the Court:

> The most intolerable evil, however, under which we have lived for the past twenty-five years, has been the changing and shifting character of our judicial decisions, by which we have been deprived of the inestimable benefit of judicial precedents as a safeguard to our rights of person and property.
>
> *State v. Russell,* 108 Idaho 58, 696 P.2d 909 (1985).

Our track record over just the past six months supports that statement:

November 23, 1984: "The Commissioners work with these cases on a daily basis and they have both experience and expertise in the workers' compensation law, which this Court has regularly stated it will defer to." *Lopez v. Amalgamated Sugar Co.,* 107 Idaho 590, 691 P.2d 1205, at 1206.

February 12, 1985: "... the Commission's determination of this issue will not be overturned by this Court as long as the determination is supported by substantial and competent evidence.... The Commission is not bound to accept the opinion of any particular doctor.... The Commission's reliance on Dr. Smith's testimony was not improper." *Horner, supra.*

June 12, 1985: (No mention of *Dawson, Horner,* or *Lopez* ) Instead, for whatever reason, the Court is now exercising its own medical expertise in derogation of the province of the Commission. I cannot but dissent.